Colleen M. WALES, Plaintiff–Appellant,

v.

BOARD OF EDUCATION OF COMMUNITY UNIT SCHOOL DISTRICT 300, et al., Defendants–Appellees.

No. 97–1062.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1997.

Decided July 21, 1997.

James T. Harrison (argued), Robert W. Funk, II, Harrison Law Offices, Woodstock, IL, for Plaintiff–Appellant.

Sally J. Scott, Lisa A. Lopatka (argued), Charles P. Rose, Franczek, Sullivan, Mann, Crement, Hein & Relias, Chicago, IL, for Defendants–Appellees.

Before POSNER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Dorothy deLacey Early Childhood Education Center is among a handful of schools in the United States that permit even the youngest pupils to pick their own fields of study. The school district that operates the deLacey Center tells us that if a pupil shows an interest in rabbits, the teacher must design a curriculum for that pupil around rabbits—while other kids in the same classroom try to learn reading and arithmetic through materials on fire engines and dinosaurs. Since its founding the Center has catered to children with special educational needs. In the fall of 1992 the deLacey Center became an "inclusion facility." Pupils with learning disabilities or behavior problems were mixed with those whose challenges were less severe. Recognizing that this would make things tough for teachers (and other pupils), the school assigned an aide to every classroom, and it invited parents to help out in the classrooms. Before long, the school district named Jane Schumacher to replace the deLacey Center's principal. Schumacher called a retreat at which the teachers were given instruction in dealing with the new situation. When the retreat took place in November, however, Colleen Wales, a kindergarten teacher, was at home, overcome by the stress of coping with hard-to-manage kids in her classroom.

Wales was not happy with the turn of events at the deLacey Center. During the 1991—92 school year Wales had been a part-time language instructor. Wales found the work fulfilling, and the school district thought well enough of her efforts to give her a full-time appointment, though in a different role. By November 1992, however, it seemed to Wales that her time was devoted more to self-defense from hyperactive kids than to instruction. Wales called for assistance in managing her class more often than did other teachers. She succeeded in having one child removed from class and sent elsewhere. Schumacher turned down Wales's request for the removal of a second child. Wales promptly took a medical leave and sent Schumacher a lengthy memorandum protesting her management of the deLacey Center. Its final two paragraphs convey the tenor:

> Under my contractual obligations with the district, I was employed to serve as a teacher, not as a guard in a detention room. In addition, I have professional and legal obligations to ensure the safety of my students and to provide them with a positive learning environment. This cannot be accomplished under the present lack of procedure and/or lack of complying with established procedure in terms of discipline for students who cannot or will not comply with accepted norms of behavior in a regular classroom setting. In addition, I do not have to expect that being a punching bag for a student is an assigned job task of a teacher.
>
> As such, I would like some form of written documentation and/or clarification, consistent with state statute, as to what actions/procedures will be enacted in order to perform/maintain discipline within the classroom as well as what actions will be taken to ensure that other students, as well as myself, will not be subjected to continued physical abuse without repercussions. As an employee of the district, I feel that it is only right that procedures be clarified <u>and</u> followed through, especially now that the situation has deteriorated to one where my personal health has been affected.

(Emphasis in original.) Schumacher did not respond to this call for more discipline and extra bureaucracy; neither did Norman Wetzel, Superintendent of the District, to whom Wales sent a copy.

Principals of the District evaluate untenured teachers (as Wales was) three times per year by sitting in on their classrooms. Wales feared that her memorandum had soured relations with Schumacher and asked for a different evaluator, but the District did not accommodate this request. Schumacher observed Wales's class twice in December 1992 and once in January 1993. She prepared an unfavorable evaluation, which led the Board not to renew Wales's contract. Wales left the District's employ at the end of the 1992—93 school year.

Wales demanded and received arbitration under her union's collective bargaining agreement with the district, contending that Schumacher failed to confer with Wales before observing her classes. The arbitrator concluded that the lack of consultation was Wales's fault and sustained the discharge. Next Wales filed a complaint with the Office of Civil Rights at the Department of Education, contending that the school district retaliated against her because she stood up for the rights of the pupils. The Office conducted an investigation, concluded that the claim was unfounded, and closed the file. In this litigation, Wales offers a third theory: that the District fired her on account of the memo, which she characterizes as speech protected by the first amendment. The district court granted summary judgment to the District—not because the memo was unrelated to the discharge (though the record does not establish any link), or because it caused relations to deteriorate and therefore was unduly disruptive (though Wales's request for an evaluator other than Schumacher implies that in her view the memo had the potential to create such a baleful effect), but because the memo was not protected speech in the first place. The judge read the memorandum as part of a dialog between Wales and Schumacher about how to deal with disruptive pupils: Wales wanted them to be removed (so that someone else would have to cope with them) or disciplined, and Schumacher wanted Wales to handle them better

in order to promote the education of all of the school district's charges. "[P]laintiff and Schumacher did not see eye-to-eye on how, or who was, to handle behavioral problems in the classroom. The memorandum is a clear expression of plaintiff's position on that matter." Give-and-take is normal in employment, and the district court thought that the Constitution does not arm one participant with a right to damages if the other prevails.

How the deLacey Center is managed is undoubtedly a question of public importance. If a newspaper ran an editorial arguing that the deLacey Center should not be an "inclusion facility," or that disruptive kids should be removed from classrooms so that others may learn, that expression would be protected by the first amendment. School boards are elected precisely because parents take a vital interest in such matters, legitimate subjects of public debate and political decision. It follows, Wales believes, that under the approach of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the school district must put her memo out of mind when deciding whether she remains on the faculty. See also *Hulbert v. Wilhelm*, 120 F.3d 648, 652–654 (7th Cir.1997). We grant the premise that the speech concerns an issue of potential public interest but believe that the conclusion does not follow. A school is entitled to insist that its staff carry out the educational philosophy espoused by the elected school board and the principal the board appoints. A Montessori school need not employ teachers who hanker for stern discipline. A memorandum proclaiming support for a disfavored educational approach (removing or disciplining disruptive kids) may be useful to a school in determining how a teacher runs her classroom.

When a communication is simultaneously protected speech (as a call to the public to change the way the schools run) and a sound reason for an employer to act (when it reveals information relevant to performance on the job), it is essential to determine how the speech has been taken into account. Did the school district penalize an expression of views about how the schools ought to run (forbidden) or consider an expression that revealed how the teacher manages or wants to manage her own class (permitted)? One clue, here as in *Cliff v. Indianapolis Board of School Commissioners*, 42 F.3d 403, 409–11 (7th Cir.1994), is to whom the statement was made. Wales did not issue a public call for change; she complained to her immediate supervisor (and to her supervisor's supervisor) about how the conditions in her classroom affected her. Although the first amendment is not limited to speech that is broadcast to the world, see *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979), an employee's decision to deliver the message in private supports an inference that the real concern is the employment relation—and a school district *as employer* may react to speech about the workplace in ways a government *as regulator* may not. *Waters v. Churchill*, 511 U.S. 661, 671–75, 114 S.Ct. 1878, 1885–88, 128 L.Ed.2d 686 (1994) (plurality opinion). (Although the lead opinion in *Waters* was joined by only four Justices, it is a holding of the Court under the approach of *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993–94, 51 L.Ed.2d 260 (1977).) What we said in *Cliff*—another case in which a teacher took issue with a school district's approach to classroom management and argued that the first amendment prevented her employer from discharging her in response—is equally true here: "Although ... [the teacher's] complaints addressed a subject of general interest to the public, her claim still fails as a matter of law because her expression was addressed only to the personal impact of those issues on [her]. Her speech was thus intended to benefit only her personal interests in a private dispute with her employer." 42 F.3d at 409. And here, as in *Cliff*, the school district responded as an employer—by hiring someone else to replace an unsatisfactory teacher—rather than as a regulator would respond.

Cases such as this illuminate a problem posed by *Pickering*. Speech has multiple objectives. One statement can address issues of both public and private concern. An employer may respond to either or both of these facets of the speech. *Pickering* ex-

presses optimism that courts can separate one kind of speech (and one kind of response) from the other at low cost, and then permit the public employer to react when speech goes "too far" (or becomes "too disruptive") while protecting speech that has net public benefits. How this is to be done *Pickering* does not say. When both speaker and employer have (or appear to have) mixed motives, the task is intractable. And the cost can be substantial—by which we mean not the monetary costs litigants bear themselves, or the time the judicial system must divert from serving the needs of other litigants, or the risk of error, but the opportunity costs that will be borne by the public when public servants seek to avoid litigation. See *Walsh v. Ward*, 991 F.2d 1344, 1346 (7th Cir.1993). Exchanges of views between employees and their supervisors are routine—especially at schools, which deal in expression. Every teacher has, or easily can gin up, a claim that speech made a difference, as often it should. What people say reflects or presages what they do, and employers (public and private alike) therefore may properly consider job-related speech when making decisions. *Pickering and Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), say that speech about a topic of public concern may be a ground of adverse action only if the speech is disruptive, but non-disruptive speech can be highly informative about how well a given person fits a particular slot.

Rational employers routinely consider speech: think about a local treasurer's reaction to a subordinate's statement (in private, to avoid disruption) along the lines of "Everyone in this office is underpaid and entitled to steal what he can." Because public employers do, or can be made to appear to, react to non-disruptive speech, good and bad employees alike can threaten to impose costs on public employers who demote or fire them. Wales wants Schumacher and other managers of the School District to pay her substantial amounts of money. Principals and other public employees are not compensated for taking these risks, and they are not necessarily indemnified when they lose. Faced with both a threat to the pocketbook and the substantial diversion of time from the principal task at hand (recall that this is Wales's *third* challenge to her discharge, itself the culmination of a lengthy process), many a supervisor will let things be. Then the people who suffer are the children, deprived of the best education the school district can provide. That was not the goal of the Supreme Court in *Pickering*, but it is an inevitable consequence; it is not possible to protect public employees' right to speak their minds without creating incentives that threaten the quality of services agencies deliver to the public. The lead opinion in *Waters* recognizes this, but the Court has so far been unable to develop a set of rules that curtails the problem.

Open-ended balancing approaches of the sort announced in *Pickering* create unavoidable risks and costs for well-intentioned public employers, risks that the doctrine of qualified immunity reduces but not to zero. As an inferior tribunal, our part is to apply the Supreme Court's approach, fuzzy though it may be. Our best judgment is that Wales's memorandum is closer to the "private" than to the "public" end of the spectrum, even though it has elements of both. A school district is entitled to put in its classrooms teachers who share its educational philosophy. This does not mean that Wales is a bad teacher; it reflects only the school district's judgment that she was not well suited to an "inclusion facility"—coupled with the fact that, as an untenured employee, Wales was not entitled to displace another teacher elsewhere in the school district. Matching a person's skills to the job at hand is a difficult yet vital task for any employer, and the first amendment did not require defendants to retain at the deLacey Center someone they believed was not best for the children.

AFFIRMED.