123 F.3d 1010
 121 Ed. Law Rep. 29
 Collette A. KHUANS, Plaintiff-Appellee,
v.
SCHOOL DISTRICT 110, James Nelson, Superintendent, A.E.R.O.
Special Education Cooperative, Charles J. Sahs
School, Defendants,
and
James Nelson, Defendant-Appellant.
 No. 96-3664.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 28, 1997.
Decided Sept. 2, 1997.
 
 Herbert H. Victor (argued), Karen Spence, Cynthia L. Hackerott, Chicago, IL, for Plaintiff-Appellee.
 John J. Piegore (argued), Mary E. Haeger, Kiesler & Berman, Chicago, IL, for Defendant-Appellant.
 Before CUDAHY, DIANE P. WOOD, and EVANS, Circuit Judges.
 TERENCE T. EVANS, Circuit Judge.
 
 
 1
 James Nelson, a school superintendent who relies on qualified immunity as a defense, was rebuffed by the district court when he sought a quick exit from this suit brought by Collette Ann Khuans. Because his request should have come up a winner, we reverse.
 
 
 2
 At this early stage of the proceedings we must assume that the allegations in Ms. Khuans' complaint are true. So we set out her view of the facts without, of course, vouching for their accuracy.
 
 
 3
 A.E.R.O. Special Education Cooperative of Cook County provides special education services to 12 different school districts, including District Number 110. A.E.R.O. employed Ms. Khuans from 1986 through 1994 as a part-time school psychologist at the Charles J. Sahs School in District 110, located in Central Stickney, Illinois. Khuans' duties, which she performed competently, included diagnosing students who displayed emotional or learning difficulties, counseling those students, and developing individualized educational programs for them when necessary. Khuans' employment relationship with A.E.R.O. was governed by an annually renewed contract.
 
 
 4
 Khuans' immediate supervisor at Sahs was Lynda Zielke, also an A.E.R.O. employee. In the autumn of 1993, Khuans and other special education staff members at Sahs encountered problems with Zielke, particularly because they often could not find her on school property. They also had difficulty "communicating" with her. Zielke was also departing from what Khuans and other A.E.R.O. employees believed were proper legal procedures governing special education services.
 
 
 5
 In early December, Khuans related her thoughts on Zielke's shortcomings to the Sahs principal, James Steyskal, who then met with the special education staff (minus Zielke) on December 14, 1993. Steyskal reported the conflict to Zielke's supervisor at A.E.R.O., Assistant Administrator Tom Bever, who declined to address the matter until the staff first met with Zielke. On December 15, 1993, the members of the special education staff, with Khuans as "liaison" (so designated by Steyskal), met with Zielke and relayed their concerns. According to Khuans, as a result of her speaking on behalf of her co-workers, she received a "browbeating" from Zielke when the two met privately.
 
 
 6
 In early February 1994, Khuans took her continued complaints about Zielke to Superintendent Nelson. She discussed the propriety of some changes in services, which Zielke planned and Nelson approved, as well as a memo written by Nelson (and not intended for Khuans' eyes) indicating his belief that Khuans' services were no longer needed.
 
 
 7
 On February 22, 1994, Khuans was called into a meeting with Nelson, Steyskal, and Bever. Bever told Khuans that the District (apparently this was Nelson's decision) not only was cutting the hours of her position but also that she was going to be replaced. Bever added that he was displeased that she had tried to cause dissension. In March of 1994, Khuans received written notification that her annual contract with A.E.R.O. would not be renewed for the following school year. True to its word, A.E.R.O. did not renew her contract when it expired in June.
 
 
 8
 Khuans has sued District 110, Nelson, and A.E.R.O. for damages under 42 U.S.C. § 1983, alleging violation of her First Amendment rights.[1] In regard to Nelson, Khuans claims he sought her removal from Sahs in retaliation for her speaking out about Zielke's failure to follow proper legal procedures regarding the education of disabled children. This, Khuans says, caused A.E.R.O. to refuse to renew her annual contract.
 
 
 9
 Nelson and the School District moved for dismissal for failure to allege an employment relationship between Khuans and the District. Nelson alternatively moved to dismiss based on qualified immunity. On September 30, 1996, the district court denied the motions. A memorandum opinion followed on December 16, 1996, with the district judge's note that the qualified immunity issue "would be best addressed at a later time when more facts have become apparent."
 
 
 10
 Nelson appeals only the denial of qualified immunity. Because qualified immunity is immunity from suit, not merely a defense to liability, and effectively is lost if a case erroneously is permitted to go to trial, the denial of qualified immunity is a final appealable order for purposes of 28 U.S.C. § 1291, if based solely on a matter of law. Behrens v. Pelletier, 516 U.S. 299, ----, 116 S.Ct. 834, 839-40, 133 L.Ed.2d 773 (1996); Mitchell v. Forsyth, 472 U.S. 511, 526, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). If, however, qualified immunity was denied because there is a genuine issue of fact for trial, the denial is not appealable immediately. Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). As we assume at this time that the facts of the complaint are true, whether qualified immunity applies to Nelson is a pure legal question, so we have jurisdiction. See Behrens, 516 U.S. at ----, 116 S.Ct. at 840; Mitchell, 472 U.S. at 528, 105 S.Ct. at 2816.[2] We review the matter de novo.
 
 
 11
 To prevent government officials from being hampered in the discharge of their duties by the fear of lawsuits, officials performing discretionary functions generally are shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). There is no doubt here that at the time of the alleged events giving rise to Khuans' claim, Nelson was a government official performing discretionary functions. To determine whether Nelson met Harlow's test of objective legal reasonableness, we scrutinize his "conduct as alleged in the complaint." Behrens, 516 U.S. at ----, 116 S.Ct. at 840. Therefore, qualified immunity will apply unless (1) the conduct alleged in the complaint sets forth a constitutional violation and (2) the constitutional standards were clearly established at the time of the alleged violation. Johnson v. Fankell, 520 U.S. ----, ----, 117 S.Ct. 1800, 1803, 138 L.Ed.2d 108 (1997); Lanigan v. Village of East Hazel Crest, 110 F.3d 467, 472 (7th Cir.1997). We think Khuans fails to establish either condition.
 
 
 12
 Khuans rests her claim, under 42 U.S.C. § 1983, on an alleged violation of her First Amendment right to free speech. Generally speaking, public employment cannot be conditioned on a basis that infringes an employee's constitutionally protected interest in freedom of expression. Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). But although it now is clear that government employees do not lose their First Amendment rights to free speech and association when they walk through their employers' doors, the state nevertheless has additional interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of citizens in general. Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. Waters v. Churchill, 511 U.S. 661, 675, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994). As an employer, a governmental agency must have the "prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." Connick, 461 U.S. at 151, 103 S.Ct. at 1692. The public employer is not required to wait until actual disruption occurs, either. Where employee speech carries the potential to be disruptive, the public employer must have the ability to move quickly. Id. at 152, 154, 103 S.Ct. at 1692, 1693.
 
 
 13
 The Pickering Court indicated that in cases like Khuans', the task is to "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. Thus, to be protected by the First Amendment, (1) the speech by a government employee must be on a matter of public concern, and (2) the employee's interest in expressing herself on the matter must not be outweighed by any injury the speech could cause to the interest of the state, as employer, in promoting efficient and effective public service. Waters, 511 U.S. at 668, 114 S.Ct. at 1884; Smith v. Fruin, 28 F.3d 646, 650 (7th Cir.1994).
 
 
 14
 In Connick, 461 U.S. at 143, 147, 103 S.Ct. at 1687, 1690, the Court reiterated the importance of the requirement that an employee's speech involve a public issue:
 
 
 15
 The repeated emphasis in Pickering on the right of a public employee "as a citizen, in commenting upon matters of public concern," was not accidental. This language ... reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter.
 
 
 16
 ....
 
 
 17
 [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.
 
 
 18
 Consequently, if the facts alleged in Khuans' complaint show that she lost her employment contract due to Nelson's retaliation for her exercise of only private speech, we need go no further. If the facts asserted in her complaint establish that her speech related to a matter of public concern, or involved both private and public issues, then Pickering requires a balancing of her interest in the speech against the interest of her employer. As we recently noted in Wales v. Board of Education, 120 F.3d 82, 85 (7th Cir. 1997), Pickering is fuzzy at best regarding how the balancing of interests is to be done. But even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong. Board of County Comm'rs v. Umbehr, 518 U.S. 668, ----, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996). And a plaintiff cannot prevail in a claim of retaliatory discharge if the decision to terminate her would have been reasonable even in the absence of the protected conduct; the protected conduct does not as a matter of law insulate the employee from termination based on unprotected conduct. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Conner v. Reinhard, 847 F.2d 384, 393 (7th Cir.1988).
 
 
 19
 The Pickering balancing test is applied on a case-by-case basis. See Pickering, 391 U.S. at 569, 88 S.Ct. at 1734 ("Because of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged."). To determine whether an employee's statements address a matter of public concern we look at their content, form, and context. Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690-91; Fruin, 28 F.3d at 651. Content is the most important of these factors. Fruin, 28 F.3d at 651. Speech on matters of public concern has been defined as speech relating to any matter of political, social, or other concern to the community. Connick, 461 U.S. at 146, 103 S.Ct. at 1689.
 
 
 20
 To determine whether the government's interest in providing services efficiently outweighs the employee's free speech rights, we consider:
 
 
 21
 (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.
 
 
 22
 Caruso v. DeLuca, 81 F.3d 666, 670 (7th Cir.1996) (quoting Wright v. Illinois Dept. of Children & Family Servs., 40 F.3d 1492, 1502 (7th Cir.1994)). In addition, "our inquiry must also take into account 'the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?' " Fruin, 28 F.3d at 651 (quoting Linhart v. Glatfelter, 771 F.2d 1004, 1010 (7th Cir.1985)).
 
 
 23
 In balancing Khuans' speech and the government's rights as employer, it's helpful to compare the facts of Pickering with those in Connick and our recent decision in Wales. In Pickering, the Supreme Court held impermissible under the First Amendment the dismissal of a high school teacher for sending a letter to a local newspaper in connection with a proposed school tax increase. The teacher's letter criticized the board of education for its allocation of school funds between athletics and education and its handling of bond issue proposals. The issues were the subject of public attention at the time and the teacher was exercising his rights as a citizen; for that, said the Court, he could not be fired. Pickering, 391 U.S. at 571-74, 88 S.Ct. at 1736-37. The Court was careful, though, to point out certain details of Pickering's situation. For instance, Pickering's statements were in no way directed towards any person with whom he normally was in contact during the course of his daily work as a teacher. Thus, no question of maintaining either discipline by immediate superiors or harmony among co-workers was presented. Id. at 569-70, 88 S.Ct. at 1735-36. And Pickering's comments also did not impede his teaching performance or interfere with the regular operation of the schools. His employment was only tangentially related to his communication. Id. at 574, 88 S.Ct. at 1737.
 
 
 24
 In Connick, plaintiff Myers, when faced with an unwanted transfer to another department, expressed to her supervisors her disagreement with the move and then distributed a questionnaire to her coworkers soliciting their views on office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressure to work in political campaigns. Myers was fired for distributing the questionnaire, which her supervisors considered an act of insubordination. The Supreme Court found that with the exception of the question about pressure to work in political campaigns, the questionnaire involved private, not public concerns--the focus of the questions was not to evaluate the performance of the office but instead "to gather ammunition for another round of controversy with her superiors." Connick, 461 U.S. at 148, 103 S.Ct. at 1690. Even though one statement involved a matter of public concern, Myers' termination was not a First Amendment violation. In performing a Pickering balance, the Court found any harm to public debate outweighed by the government's interest as an employer. The questionnaire interfered with working relationships and potentially undermined confidence in Myers' supervisors. The time, place, and manner of the distribution required not only Myers to leave her work but others to do the same to complete the questionnaire--"the fact that Myers, unlike Pickering, exercised her rights to speech at the office supports Connick's fears that the functioning of his office was endangered." Connick, 461 U.S. at 153, 103 S.Ct. at 1693.
 
 
 25
 Finally, in Wales, a kindergarten teacher sent her supervising principal a memorandum protesting management of the school, in particular the lack of procedures for disciplining students. The memo led to the school board's decision not to renew the teacher's contract. When the teacher claimed she was fired in violation of her right to free speech, we recognized that although how the school was managed was a question of public importance, her memo was closer to the "private" than the "public" end of the spectrum and the district could terminate a teacher who did not share its educational philosophy. Wales, 120 F.3d at 84-85. One good clue to the true nature of Wales' speech was the person to whom her statements were made; she did not issue a public call to change, but instead complained to supervisors. Id. at 85.
 
 
 26
 We turn now to Khuans' expressions of her rights to free speech. First, in December 1993 she went to Principal Steyskal and relayed to him the special education staff's "difficulties" with Zielke, which Khuans' complaint indicates were that "Zielke was often not found on school property during her scheduled hours, her staff found her difficult to communicate with, she would depart from established legal procedures for special education, etc."[3] According to Khuans' complaint, she sought to protect her students' rights to a free appropriate public education as set forth in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., (IDEA) by informing Steyskal at that meeting, and Bever at a later date, that Zielke failed to give parents notification of educational planning meetings, which parents have a right to attend; predetermined the classification of certain children prior to a diagnostic team's input; changed certain students' placement and services without required diagnostic team input or parental notification; and disregarded the individualized educational programs of special education children transferred to Sahs. Second, when Khuans met with Superintendent Nelson, she "inquired of Nelson about the propriety of a certain change of services sought to be implemented by Zielke, and which had apparently been approved by Nelson," and showed Nelson his memo reflecting Zielke's "problem and solution" for the next year's staff, which entailed eliminating Khuans. Although Khuans doesn't actually state that she discussed IDEA violations with Nelson, she claims he "was aware that the occurrences about which [she] complained involved violations of federal and state legal procedure, and as such, were matters of public concern about which [she] had a constitutionally protected right to speak."
 
 
 27
 We agree with Khuans and the district court that if her complaint is true regarding her statements about Zielke's failure to follow IDEA mandates, then that particular speech involved a matter of public concern. Public criticism of a government employer's policies can be protected speech. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). And bringing to light actual or potential wrongdoing during the provision of public services obviously is in the public's interest. Cf. Connick, 461 U.S. at 148, 103 S.Ct. at 1690. Government employees often are in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions. Waters, 511 U.S. at 674, 114 S.Ct. at 1887.
 
 
 28
 If those were Khuans' only expressions or complaints about Zielke, her case might withstand a motion to dismiss based on qualified immunity. But this tidbit of speech on a matter of public concern was only one of a bagful of complaints regarding Zielke about which Khuans spoke. This is a case where a plaintiff, by pleading too much, has pled herself out of court. Khuans asserts that she relayed to Principal Steyskal the special education staff's general "difficulties" with Zielke. Again, in addition to IDEA concerns, those included that "Zielke was often not found on school property during her scheduled hours, her staff found her difficult to communicate with, ... etc." In addition, Khuans complains that Zielke had a "tendency toward hostility and argumentation." Khuans fails to allege, in fact could not allege, that she was speaking as a member of the general public as opposed to an employee upset with her supervisor and unhappy with how things were being run. Except for the IDEA comments, what Khuans alleges is that she did not like how Zielke performed her job. The content of all her comments except the few concerning IDEA violations concern solely private employment matters. Her point in speaking with Steyskal and Nelson was not whistleblowing regarding IDEA compliance. It was, pure and simple, an airing of her strong conflict with Zielke.
 
 
 29
 The district court did not focus on the entire content of Khuans' speech, and this is where it began to take a wrong turn. In its December 16, 1996, opinion, the court failed to address the content of this speech and the context of the IDEA comments among the laundry list of Zielke's faults. The court assumed that because one item of speech was protected, Khuans stated a constitutional violation. But the form and context of her comments on IDEA violations indicate they were just one part of the litany of complaints--note Khuans' use of the word "etc."--on Zielke's supervision skills and personal style. Like the plaintiff in Wales, our best judgment is that Khuans' speech is much closer to the "private" than the "public" end of the spectrum, and thus not protected. See Wales, 120 F.3d at 85.
 
 
 30
 Even if all of Khuans' speech was on matters of public concern, the next step would be to analyze the effects of her speech under the Pickering balancing test, a step the district court did not take. We believe that here, too, Khuans has pled herself out of court because of the actual and potential disruption caused by her remarks. At oral argument, Khuans contended that her complaint does not allege any disruptive effect from her speech. While we admit the complaint does not literally say "the department was disrupted", Khuans nevertheless alleges certain content, times, places, and manner of speech, which, reasonably viewed, can be understood to have endangered the efficient delivery of public services. The facts in her complaint indicate disruption of the Sahs special education department; interference with the relationships between the special education staff, Zielke, the Sahs principal, and the School District superintendent; a challenge to Zielke's authority as supervisor; and hostility between Khuans and Zielke. For instance, Khuans' complaint indicates that her comments led to two full staff meetings where Zielke's skills were assailed. Reasonably viewed, Khuans' questioning of her supervisor in front of the principal and her co-workers created a potential problem in maintaining authority and discipline within the department. As another example, Khuans alleges that proper procedures in providing special education involve close contact and input between Zielke and staff members on diagnostic teams, and that as a result of Khuans' comments "Zielke was clearly angry at what the staff had told Steyskal," Khuans was subjected to a "half-hour of angry browbeating" by Zielke after the staff meeting, and Khuans' co-workers, who themselves were uncomfortable with confronting Zielke, had to attend a full staff meeting with Zielke and then were each scheduled to meet with her individually to discuss the matters Khuans raised. Khuans' comments could reasonably be considered to have endangered the relationships and confidence between the staff and Zielke and caused disharmony within the department. In addition, because her comments resulted in at least two meetings concerning the entire special education staff, the regular daily operations of the department were disrupted.[4] The majority of considerations we described in Caruso and Wright favor Nelson's actions.
 
 
 31
 We believe Khuans' speech as alleged in the complaint falls in line closer to Connick than to Pickering. Unlike Pickering, Khuans' employment situation was directly related to the communication. Her comments were aimed at her immediate superior, and her complaint indicates hostility and conflict between her and the supervisor--as well as her co-workers and the supervisor--as a result of her complaints. Her speech resulted in disruption of daily operations as was the case in Connick. And similar to Connick, Khuans' speech on a matter of public concern was merely one item among several, all of the rest of which involved private-matter complaints about Zielke's habits and how she ran the special education department. Our review of Khuans' pleadings, as a whole, convinces us that her complaints about Zielke were essentially private in nature. To the extent her speech encompassed one item of public concern, her interest in raising that matter as she did was outweighed by the disruption--actual and potential--that she caused. This is one of those cases we recently mentioned in Gustafson v. Jones, 117 F.3d 1015 (7th Cir.1997), involving an unprotected employee grievance and where the plaintiff pleads herself out of court by including facts establishing that the employer would prevail under Pickering's test. We believe any statements about IDEA compliance to be merely one piece of Khuans' disruptive conflict with her supervisor--a private employment matter with which the federal courts should not interfere.
 
 
 32
 When an employee speaks out about actual wrongdoing or breach of public trust on the part of her superiors, or speaks on serious matters of public concern, the government must make a more substantial showing than otherwise that the speech is, in fact, likely to be disruptive before the employee's actions may be punished. See Waters, 511 U.S. at 674, 114 S.Ct. at 1887; Connick, 461 U.S. at 148, 152, 103 S.Ct. at 1690, 1692. We think that such a stronger, substantial showing exists in this case, based on Ms. Khuans' complaint. Khuans alleges that her "folly had been crossing Zielke and challenging authority" and trying to "cause dissention among the administrators." She herself pled the facts of the disruption she caused. Nelson's interest, as School District superintendent, in bringing order to the special education department justified removal of the employee he felt was hindering the department's operation. Nelson made an incident-specific response to speech he thought was injurious to future working relationships at the school. It's true Nelson may have been able to quell the storm by canning Zielke, but that was his call, as the District superintendent, to make. On the facts alleged, Nelson did not violate the Constitution by anything he did in causing Khuans to be sacked.
 
 
 33
 Because Khuans' complaint fails to allege a constitutional violation, we could stop here. We note, however, that even if Khuans' complaint did allege a constitutional violation, Nelson nevertheless is entitled to qualified immunity because constitutional standards, as applied to a situation like this, were unclear at the time Khuans' contract was not renewed. For our analysis so far we have assumed that Khuans was a public employee. But Khuans (as well as Zielke) was an employee of A.E.R.O., an independent contractor, who provided services to the School District. At oral argument, Khuans' counsel told us he thought she was paid by A.E.R.O. as well. Nowhere in the complaint does Khuans allege that her employment relationship was, even for practical purposes, with the District rather than A.E.R.O. The closest she gets is her accusation that Nelson made the decision not to renew her services within District 110. But A.E.R.O. worked for 12 school districts, and Khuans fails to assert that the decision of Nelson on behalf of District 110 did anything to prevent her placement with any other A.E.R.O. client.
 
 
 34
 In short, Khuans alleges termination of an independent contractor relationship.[5] And back in mid-1994, whether the analysis regarding First Amendment rights of public employees to free speech extended to independent contractors was an unsettled matter. Not until June 28, 1996, did the Supreme Court address whether and to what extent the First Amendment restricts the freedom of federal, state, or local governments to terminate a relationship with an independent contractor because of the contractor's speech. Umbehr, 518 U.S. at ----, 116 S.Ct. at 2346. In Umbehr, the Supreme Court indicated that when an independent contractor has been fired because of her exercise of free speech, we must balance interests pursuant to Pickering, adjusting for any differences between the employee and independent contractor situations. Umbehr, 518 U.S. at ----, ----, 116 S.Ct. at 2349, 2352.
 
 
 35
 At the time of Nelson's actions, however, the application of the Pickering balancing test to independent contractors was not so certain.[6] In this circuit an independent contractor without a property interest in his contract with the government had no protection against having that contract terminated in retaliation for his exercise of his First Amendment right of association. Downtown Auto Parks, Inc. v. City of Milwaukee, 938 F.2d 705, 708-10 (7th Cir.1991); Triad Assoc., Inc. v. Chicago Housing Authority, 892 F.2d 583, 586-88 (7th Cir.1989).[7] Downtown Auto and Triad considered solely whether, under the rules of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the First Amendment forbids the use of political criteria in awarding or terminating public contracts. Because they dealt only with the patronage situation, Nelson could have inferred from them either that an independent contractor--because she was not actually a public employee--similarly had no protectable First Amendment rights against termination of her contract in retaliation for the exercise of free speech, or, instead, that an independent contractor's free speech--as opposed to political affiliation--was fully protected to the extent of the speech of an ordinary citizen (remember that Pickering gives the government more leeway in restricting its employees' speech).
 
 
 36
 Back in mid-1994, the Eighth and Ninth Circuits extended the Pickering-Connick analysis to cases where an employer-employee relationship did not exist. See, e.g., Havekost v. United States Dept. of Navy, 925 F.2d 316, 318-20 (9th Cir.1991) (licensee grocery bagger terminated after circulating petition); Smith v. Cleburne County Hosp., 870 F.2d 1375, 1381-84 (8th Cir.1989) (independent contractor surgeon denied staff privileges at hospital). The Fifth and Tenth Circuits, without analysis, had assumed an independent contractor could assert a First Amendment retaliation claim. See, e.g., Caine v. Hardy, 943 F.2d 1406, 1415-16 (5th Cir.1991) (en banc) (independent contractor anesthesiologist lost clinical privileges at public hospital); Abercrombie v. City of Catoosa, 896 F.2d 1228, 1233 (10th Cir.1990).[8] But in this circuit, in light of Downtown Auto and Triad, that was not necessarily the case. And the law remained unclear within other circuits as well. See Ambrose v. Knotts, 865 F.Supp. 342 (S.D.W.Va.1994) (free speech protection granted to public employees in Pickering and Connick did not extend to independently contracting consultant).
 
 
 37
 "For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel ... the conclusion for every like-situated, reasonable government agent that what [he] is doing violates federal law in the circumstances." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1150 (11th Cir.1994). The least that can be said here is that at the time Khuans lost her job, whether independent contractors could be terminated for their exercise of free speech in the workplace was unaddressed, undecided and unsettled in this circuit. The district court agreed that if Khuans is considered an independent contractor, then prior to Umbehr and O'Hare the constitutional standards "may not have been as clear from Nelson's perspective." But the court then incorrectly concluded that because it "is presently unclear whether or not the right is clearly established for the purposes of Nelson's immunity" the immunity matter would be put off until more facts became apparent. The clarity of the law back in 1994 itself is solely a question of law, however, and further facts won't help a bit. The matter can be decided now, before discovery, in favor of Nelson. In the circumstances of this case, where protection for Khuans, as an employee of an independent contractor, was not compelled by pre-existing law, Nelson could not reasonably have known he was violating the Constitution when he played a role in the decision to fire Ms. Khuans.[9]
 
 
 38
 On the matter of Nelson's qualified immunity, the district court's denial of his motion to dismiss is
 
 
 39
 REVERSED.
 
 
 40
 DIANE P. WOOD, Circuit Judge, concurring.
 
 
 41
 The majority opinion in this case finds that Superintendent James Nelson is entitled to qualified immunity from suit for two independent reasons: first, because the complaint filed by Collette Ann Khuans fails to state a claim for a violation of her First Amendment interests under the line of cases that includes Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and second, because Superintendent Nelson did not violate any clearly established constitutional norms when he decided that she should be replaced. I do not agree with the first of these conclusions, for the reasons I explain briefly below. Nevertheless, I do agree that Nelson was entitled to qualified immunity from suit on the second ground, and I therefore concur in the majority's opinion to that extent and in the result it reaches.
 
 
 42
 In order to find that Khuans failed to state a claim, we would need to conclude that there is no set of facts Khuans could present under which she could prevail, taking the allegations of her complaint in the light most favorable to her. I believe such a conclusion would be wrong on this record, given the nature of her allegations and the balancing test that Pickering and Connick require. The majority agrees that at least some of Khuans' speech involved matters of public concern and thus that it is necessary to reach the question whether the government's interest in an effective workplace outweighed her interest in free speech. See, e.g., Board of County Comm'rs v. Umbehr, 518 U.S. 668, ---- - ----, 116 S.Ct. 2342, 2347-48, 135 L.Ed.2d 843 (1996). Many of the points Khuans raised about Lynda Zielke, such as her alleged failure to give parents notification of educational planning meetings, her alleged predetermination of the proper classification for children, and her alleged practice of disregarding the individualized educational programs of children transferred to the Sahs school, implicate serious questions of public policy. Taking all the facts in the light most favorable to Khuans, and taking into account the fact that we are only at the pleadings stage, and thus do not have the benefit of a more complete record, I cannot say as a matter of law that the Pickering balance favors the government. The majority, which relies on Wales v. Board of Educ., 120 F.3d 82 (7th Cir. 1997), ignores the fact that the Wales court had the benefit of the summary judgment record, and on that basis it was able to conclude that the public employee's speech was not entitled to First Amendment protection. See also Gustafson v. Jones, 117 F.3d 1015, 1018 (7th Cir.1997) (discussing the difficulties with attempting to resolve the Pickering balancing test solely on the basis of the pleadings).
 
 
 43
 I am particularly disturbed by the majority's decision to reach out and conduct this balancing process without the benefit of any additional factfinding or a summary judgment record like the one available to the Wales court because Khuans' lawsuits against School District 110 and A.E.R.O. Special Education Cooperative are still pending. Our decision here may be seen as effectively deciding those cases as well, even though many of the considerations relevant to the claim against Superintendent Nelson will have little or no bearing when the district court turns to the claims against the School District and A.E.R.O.
 
 
 44
 Nelson's appeal in this court concerns only the question of qualified immunity. I would resolve that claim by looking to the second part of the test for qualified immunity, namely, whether the constitutional standards applicable to his behavior were clearly established at the time of the alleged violation. Johnson v. Fankell, --- U.S. ----, ----, 117 S.Ct. 1800, 1803, 138 L.Ed.2d 108 (1997). For the reasons set forth in the majority's opinion at 1018-20, I agree that the standards were unclear. It would be asking quite a bit of school superintendents to expect them to resolve conflicts in the circuits and to anticipate Supreme Court rulings several years in advance of their appearance. Khuans' status as an independent contractor or an employee was at least ambiguous, and there was no reason why Nelson should have realized that he could not cooperate with the A.E.R.O. staff to secure her departure from his school.
 
 
 45
 Because Nelson's conduct, viewed objectively, violated no clearly established constitutional standard in effect at the time of his actions, I agree that the district court's decision denying his motion to dismiss on qualified immunity grounds should be reversed.
 
 
 
 [1]
 Khuans filed this lawsuit in the circuit court of Cook County, Illinois. The defendants removed the case to the Northern District of Illinois based on federal question jurisdiction, 28 U.S.C. § 1331. The section 1983 claim was count II of the complaint. Khuans voluntarily dismissed count I, which alleged intentional interference with a business relationship
 
 
 [2]
 In a roundabout way, Khuans contends that this case does involve factual disputes, which, under Johnson, would deprive us of jurisdiction of this appeal. At oral argument, Khuans asserted that because we do not know what Nelson thought or knew at the time he acted--Nelson may have been sued before or may have been familiar with pertinent constitutional law--we cannot hold Nelson qualifiedly immune. The district court seemed to agree, believing that the "true question" was whether "Nelson knew or should have known" he was violating Khuans' rights and that it couldn't decide the qualified immunity matter until after some discovery occurred. Any subjective component of the test for qualified immunity was purged, however, by the Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). What Nelson knew or didn't know doesn't matter under Harlow's objective test. Taking a Rule 12(b)(6)-type approach, we look only at whether Khuans' complaint, as a matter of law, alleges facts indicating that qualified immunity is present
 
 
 [3]
 The "various problems" with Zielke were also discussed at the meeting between Steyskal and the special education staff on December 14, but Khuans does not allege that she herself made any comments at that time and fails to describe any particular problem from that meeting involving constitutionally protected speech. Similarly, in regard to the staff's meeting with Zielke on December 15, although Khuans claims she was the "liaison" for the staff, she also asserts that "[t]he members of the staff nonetheless each relayed to Zielke their concerns for the special education program as it was progressing under Zielke," without describing what she herself said or indicating that any of the speech involved a matter of public concern
 
 
 [4]
 While the fact that Khuans spoke out in the workplace by itself could not justify retaliation against her, that fact nevertheless is highly relevant to show whether her regular duties--and those of the department and school--were disrupted. See Conner, 847 F.2d at 393 n. 7
 
 
 [5]
 Again, at oral argument Khuans contended that because we don't know at this stage of the case whether she was an employee or independent contractor, a decision on qualified immunity should be denied until a later date after some discovery. This argument is foreclosed, though, by Khuans' own complaint. If Khuans thought her position at Sahs was more like that of a school district employee, she should have pled that fact; the burden was on her to plead it. If she wished to amend her complaint to plead an employee-employer relationship, the time to do so was before this appeal. It is now too late. Moreover, if she admits that it's unclear what her status was, that's all the more reason why qualified immunity is appropriate
 
 
 [6]
 We asked the parties to provide post-hearing memoranda on whether the independent contractor defense applied in 1994 to the Pickering line of cases as opposed to the line of cases following Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In those memoranda, the parties came up with no pre-Umbehr cases directly on point
 
 
 [7]
 The Third Circuit held the same. Horn v. Kean, 796 F.2d 668 (3d Cir.1986) (en banc) (fee agents whose contracts were terminated following a change in administration were not protected by First Amendment). In Umbehr and O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), rev'g 47 F.3d 883 (7th Cir.1995), the Supreme Court rejected our reasoning, but, again, that occurred after the events of this case
 
 
 [8]
 The Fifth Circuit later officially confirmed the use of the Pickering balance to independent contractors in Copsey v. Swearingen, 36 F.3d 1336 (5th Cir.1994). The Tenth Circuit did the same in Umbehr v. McClure, 44 F.3d 876 (10th Cir.1995). Both were decided subsequent to the facts of this case
 
 
 [9]
 Khuans' status as an independent contractor reinforces our Pickering analysis. Deference still is due the government for its reasonable assessments as contractor. Id. at ----, 116 S.Ct. at 2349. In addition to its interests described above, the government has an additional interest as the hiring party in Khuans' case. Although both she and Zielke were A.E.R.O. employees, Khuans took her dispute not to her own superiors at A.E.R.O., but to the Sahs principal and the School District superintendent-who were her own employer's clients. From the client's standpoint, having to deal with the contractor's internal personnel dispute can be deemed even more disruptive to effective public service than if the matter had been among school district employees