**Odessa AYOUB, Independent Executrix of the Estate of Abdel K. Ayoub, Plaintiff–Appellant,**

**v.**

**TEXAS A & M UNIVERSITY, et al., Defendants–Appellees.**

**No. 90–2392.**

United States Court of Appeals, Fifth Circuit.

March 29, 1991.

Rehearing Denied April 24, 1991.

James W. Hill, Roberts, Hill & Calk, Longview, Tex., for plaintiff-appellant.

James C. Todd, Donald E. Branson, Ester L. Hajdar, Asst. Attys. Gen., Austin, Tex., for defendants-appellees.

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this employment discrimination-first amendment case, Odessa Ayoub, the executrix of Dr. A.K. Ayoub's ("Ayoub") estate, appeals the district court's judgment notwithstanding the verdict entered in favor of the defendants, Texas A & M University (the "University"). Ayoub had sued the University and certain University officials alleging that his civil rights had been violated when his office was relocated in retaliation against his complaints about the University's past discriminatory pay scale. The district court determined that Ayoub's speech was not protected, that the defendants were shielded by qualified immunity, that the evidence did not support the jury's verdict and entered a judgment N.O.V. We affirm the district court.

I

Ayoub, an Egyptian-born male, was hired by the University as a professor of Electrical Engineering in 1968. Among the faculty hired that year, the highest initial salary was paid to a foreign-born professor. In 1981, Ayoub filed a salary grievance with the University, complaining of his low starting salary in 1968, which he felt continued to disadvantage him. Thereafter, Ayoub complained on numerous occasions about the perceived salary disparity.

In the summer of 1984, shortly after becoming Interim Head of the Electrical Engineering Department, defendant Jo Howze ("Howze"), at the Dean's request, spent a week reviewing Ayoub's salary. Howze did not recommend an adjustment. In the summer of 1985, Howze reviewed all the salaries in the Department, recommending no raise for Ayoub and four other white United States citizens. On July 29, 1985, Howze met with Ayoub. Two days later, Ayoub wrote to defendant Richardson, Dean of the College of Engineering, again raising the issue of his salary and complaining of Howze's failure to recommend him for a raise. At Richardson's request, defendant Associate Dean Fletch-er reviewed Ayoub's salary. Fletcher concluded that Ayoub's salary was appropriate.

In the fall of 1985, defendant Erdman became Associate Dean of the College of Engineering. During the fall of 1985, Howze talked at one time or another with each of the other four defendants about Ayoub's disruptiveness. In response, Erdman began to investigate Howze's complaints about Ayoub. On November 12, 1985, Howze submitted his resignation as Department Chairman, allegedly because he no longer wanted to deal with Ayoub.

In late November 1985, Howze, Flipse, Erdman, and Fletcher discussed the possibility of moving Ayoub's office to another building, allegedly because of Ayoub's disruptiveness. Howze, as Department Head, was responsible for assigning offices within the total space allotted his department, while Flipse was responsible for allocating space within the College of Engineering. Flipse, who had apparently never met or spoken with Ayoub about the move, located a new office for Ayoub in another building. Fletcher arranged for a second parking space for Ayoub.

On December 9, 1985, Flipse wrote Ayoub, informing him he had been reassigned to a new office and asking him to return his present office keys by December 18. When Ayoub asked that the move be postponed until after finals and raised possible "unnecessary risks ... concerning [his] health," Flipse postponed the move as requested. Subsequent to this letter, and prior to the move, Ayoub met with Richardson and Erdman to argue against the move, referring to his health problems.

In February 1986, the University "Faculty Senate" appointed a special subcommittee to investigate whether the Engineering Department followed the correct procedural steps before it moved Ayoub's office. The Faculty Senate mandated the committee from its inception to destroy all records after it presented its report. The committee's report, which was admitted into evidence over the University's objection, concluded that Ayoub had been denied "due process" when the administrators reached

the decision to move his office without prior notice to him. A few days after the committee's April 9, 1986 report, Richardson and Howze moved Ayoub back to his original office.

In September 1987, Ayoub sued the University and five of its administrators, Flipse, Richardson, Howze, Erdman, and Fletcher. Subsequently, in August of 1987, Ayoub filed a charge of discrimination with the Equal Employment Opportunity Commission. The EEOC granted Ayoub a "Right to Sue" on February 20, 1988.

Ayoub claimed the University retaliated against him for speaking out about an alleged salary disparity based on national origin by moving his office to another building.

Ayoub was apparently not in good health during this time period. He had suffered an insulin shock episode in 1983 and he had suffered a previous heart attack. In February 1988, Ayoub died as a result of a second heart attack. His widow, as Independent Executrix of his estate, pursues this action.

## II

Before trial, most of Ayoub's claims were dismissed except his Title VII claim for discrimination against the University and his retaliation claim against the five administrators. At the close of Ayoub's evidence, Judge Black dismissed the Title VII claim against the University. Ayoub dropped or the court dismissed Ayoub's other claims and the only issues that went to the jury was Ayoub's First Amendment retaliation claim. The jury found that each of these individual defendant administra-

tors had punished Ayoub for exercising his constitutional right to protected free speech and awarded $625,000 in compensatory and punitive damages.[1] Judge Black subsequently entered a judgment notwithstanding the verdict for defendants, holding that Ayoub's speech was not protected, that the defendants were shielded by qualified immunity, and that the evidence did not support the verdict. Ayoub's estate timely appeals.

## III

### A

Ayoub raises four issues on appeal, all challenging the district court's justification for granting the judgment N.O.V. Initially, Ayoub argues that the district court erred in granting the J.N.O.V. on his First Amendment claim because the evidence revealed that Ayoub was punished for speaking out against a matter of public concern, that is, pay disparity directed against the foreign-born professors. We find ourselves in agreement with the district court that Ayoub's speech involved only his personal situation and hence was not protected as a matter of public concern. Accordingly, we need not address the other issues raised by Ayoub.[2]

Whether Ayoub's speech was addressed to a matter of "public concern" is a question of law. *Terrell v. University of Texas System Police*, 792 F.2d 1360, 1362 n. 2 (5th Cir.1982). Furthermore, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record."

---

**1.** The record is clear that Ayoub did not have his pay diminished nor was he discharged constructively or otherwise. There is no contention on appeal that Ayoub suffered actual discrimination in terms of pay on account of national origin or any other grounds, except at his initial hiring in 1968. The causal connection between Ayoub's damages and the defendants' conduct rests solely upon their decision to move his office to another building on campus. The record reflects that he was ultimately reinstated to his old office and that he never physically moved to his new office. Because of our disposition of the case, we do not have to get into the

knotty questions presented by the jury's damage award.

**2.** The other issues that Ayoub raises on appeal all are premised upon a finding that his speech involved a matter of public concern and hence was protected under the First Amendment. Accordingly, his claims that the individual defendants were not protected by qualified immunity, that sufficient evidence supported the jury's verdict against the individual defendants for violating his First Amendment rights, and that sufficient evidence support the jury's award of damages, are all moot.

*Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 1690 & n. 7, 1692 n. 10, 75 L.Ed.2d 708 (1983). We will, therefore, make an independent review of the record to determine whether the district court properly resolved the question.

### B

■■■ In *Connick,* the Supreme Court held "that when a public employee speaks *not as a citizen* upon matters of public concern, but instead *as an employee* upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 103 S.Ct. at 1690 (emphasis added). A public employee, like any other citizen, has a right to free and open debate, opinion and expression. However, when he speaks as an employee on matters that address only his personal employment conditions, he is not protected from discharge for engaging in that speech by the First Amendment. This principle is especially compelling in cases where an employee's expressions are protected against retaliation under Title VII of the Civil Rights Act.

> We recognized in *Terrell* that
>
> Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as a citizen or primarily in his role as employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.

792 F.2d at 1362. (citations omitted) In *Terrell,* we addressed whether the statements contained in a policeman's secret diary, which were critical of his supervisor and fell into the supervisor's hands, commented "upon matters of public concern." *Id.* at 1361. In holding that his diary could

not serve as a basis for his First Amendment claim, we emphasized that he made no effort to communicate its contents to the public. Although the subject matter of the comments concerning the supervisor was arguably a matter of public concern, we concluded that Terrell's comments in the diary were those of an employee and not of a citizen, and hence not protected. *Id.* at 1361, 1362–62.

It is clear to us that Ayoub's speech did not involve a matter of public concern. Ayoub's complaints focused on his own individual compensation. Only when his attorney filed the EEOC charge did Ayoub characterize his complaint in terms of a 'two-tier' *system* perpetuated by the University, whereby foreign-born professors were paid less than white, native-born professors. There is no evidence that Ayoub ever uttered such a protest at any time before the alleged retaliatory acts by the defendants. To the extent, however, that Ayoub may now couch his complaint in terms of a disparate "two-tier" pay system, the record is absolutely clear that he only complained about its application to him. Ayoub's own witnesses stated that Ayoub's complaint was that his salary was not comparable with what he perceived to be his contribution to the University. One of his witnesses stated, "I came to understand that the nature of the original complaint was that he [Ayoub] felt that he had been hired at an artificially low salary; and he claimed that was based on his national origin." Another witness, Dr. Phillips, testified, "Well, his real complaint was about his own salary, we never talked about anybody else's." Ayoub argues, however, that his complaints were consistently expressed in terms of his being a victim of a pay system that discriminated on the basis of national origin. Accepting this contention, the indisputable facts found in the record remain that Ayoub consistently spoke not as a citizen upon matters of public concern, but rather as an employee upon matters of only personal interest. Certainly, Ayoub never attempted to air his complaints in a manner that would call the public's attention to the alleged wrong.

In sum, there is no evidence that Ayoub expressed concern about anything other than his own salary. Although pay discrimination based on national origin can be a matter of public concern, in the context in which it was presented in this case by Ayoub, it was a purely personal and private matter. As we found in *Terrell,* Ayoub was not retaliated against, if he was at all, "for speaking 'as a citizen upon matters of public concern,' or for 'speak[ing] out as a citizen on a matter of general concern, *not tied to a personal employment dispute.'"* 792 F.2d at 1363 (citations omitted) (emphasis in original).

## VI

Accordingly, the district court's granting of the judgment notwithstanding the verdict is

AFFIRMED.