Mary Ann CAREY, Plaintiff,

v.

ALDINE INDEPENDENT SCHOOL
DISTRICT, et al., Defendants.

No. Civ.A. H–96–4149.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 12, 1998.

Laurence Wade Watts, Watts and Associates, Houston, TX, for Plaintiff.

Raymond L Gregory, Bracewell & Patterson, Houston, TX, for Defendant.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

Pending before this court is a motion for summary judgment filed by defendants Aldine Independent School District ("AISD") and Cleba Leschper ("Leschper"). (Docket Entry No. 13). Plaintiff Mary Ann Carey ("Carey") has filed a response. (Docket Entry No. 16). AISD has replied and has submitted two supplemental memoranda. (Docket Entry Nos. 17, 18, and 30). Carey has also submitted two supplemental memoranda. (Docket Entry Nos. 25 and 29). Based on the pleadings, the motion, the parties' submissions and supplemental submissions, and the applicable law, this court GRANTS the motion for summary judgment. The reasons for this ruling are stated below.

### I. Background

After substitute teaching for two years while working toward her teaching certificate, Mary Ann Carey began work as a special education teacher in AISD in the 1993–1994 school year. Carey taught at the Floyd B. Hoffman Junior High School under a one-year contract. On May 27, 1994, at the end of the 1993–1994 school year, Carey resigned from AISD. In a letter, Carey stated that she did not wish to continue working at Hoffman and felt that she needed to "resign in order to be free to persue [sic] employment in the Houston, area." (Docket Entry No. 17, Ex. A). Some time later, Carey reapplied for employment with AISD. She was hired on August 22, 1994, eight days into the 1994–1995 school year. Carey worked for AISD for the duration of the 1994–1995 school year, under a one-year contract, teaching at the Bethune Elementary School.

Before the 1995–1996 school year began, Carey signed another one-year contract for employment as a teacher with AISD. (Docket Entry No. 13, Tab 1, Ex. A). During the 1995–1996 school year, Carey taught a special education class at Inwood Elementary School. Leschper was the principal at Inwood Elementary School that year and was Carey's supervisor.

Carey alleges that during the 1995–1996 school year, she made numerous complaints

to AISD or Leschper. On March 22, 1996, Carey received a letter from the AISD board of trustees notifying her under section 21.103 of the Texas Education Code that her employment would not be renewed at the end of the 1995–1996 school year. Carey filed this suit in Texas state court, alleging violations of her state and federal constitutional rights as well as state law causes of action. Defendants removed.

In her third amended complaint, Carey alleges that AISD failed to renew her contract in retaliation for her complaints about AISD's and Leschper's improper handling of the special education classes at Inwood Elementary School. Carey alleges and provides summary judgment evidence that she made the following complaints:

1. Carey complained in the beginning of the school year that there were too many special education students assigned to Carey's class. After six weeks, in the middle of September 1995, AISD hired an additional special education teacher. Carey's class was divided.

2. Carey complained that during the first six weeks of school, the aide assigned to Carey's class did not spend more than one hour per day in that class. When the new special education teacher began work, that aide was assigned to the new teacher and Carey received a different aide.

3. Carey complained that after the aide was assigned to the additional special education teacher, that aide taught regular education students as well. Carey complained that if this aide was paid from special education funds and was assigned to special education classes, then her continued work with regular education students violated special education regulations. Carey asserts in her interrogatory answers that she "told Mrs. Leschper that the newspaper could get her in trouble," presumably with respect to this complaint.

4. Carey complained that she did not have a 45–minute conference period as prescribed by AISD policy, and demanded her "rightful" conference period.

5. Carey complained that she was denied a designated "planning time." She had to use the time other fourth grade teachers used for a break to prepare students needing special assistance to pass the TAAS test; care for a "self-contained" student for seven weeks; and deal with a student sent to her because of behavioral problems.

6. Carey complained that for the seven weeks she was caring for the "self-contained" student, she was denied a "rightful" lunch period, free from student duties. Carey states in her answers to interrogatories that she asked about someone looking after the special education self-contained student so that Carey could take breaks.

7. Carey complained that AISD and Leschper refused to provide Carey with necessary school supplies. Carey did not receive requested textbooks until the end of September.

8. Carey complained that AISD and Leschper failed to carry out the Individual Education Plans for some of the special education students assigned to Carey. Some of these students stayed with Carey for "many hours beyond the directives of their IEPs." Carey states in her answers to interrogatories that she asked that teachers keep the children once their lesson time with Carey had concluded.

In her lawsuit, Carey also alleged that she was "berated" by Leschper after Carey's husband called the special education department to complain that his wife had too many students; and was berated by Leschper after Carey returned a telephone call from a social worker who asked Carey questions related to the social worker's suspicion that a child in Carey's classroom was being abused at home.

In a letter dated March 19, 1996, AISD notified Carey that her employment contract with AISD would not be renewed following the 1995–1996 school year. The letter stated in pertinent part:

At a lawfully convened meeting on March 19, 1996, the Board of Trustees of Aldine Independent School District received a recommendation from the Superintendent of Schools that your employment with the school district be terminated at the end of the contract period for the 1995–1996 school year. In the Board of Trustees' judgment, the best interests of the school district will be served by terminating your employment.

Pursuant to § 21.103 of the Texas Education Code, the Board of Trustees notifies you of its intention to terminate your employment. The decision of the Board of Trustees is final and may not be appealed.

(Docket Entry No. 13, Ex. B).

Carey's employment contract expired at the conclusion of the 1995–1996 school year. AISD did not renew the contract.

Carey alleges that she filed a grievance with her supervisor, Leschper, on March 29, 1996.[1] AISD's grievance policy requires a complainant to file a grievance with the AISD superintendent. (Docket Entry No. 13, Tab 2, Ex. A).[2] Carey received no response from AISD to her March 29 grievance. On June 25, 1996, Carey filed a grievance directly with the AISD superintendent's office. The grievance incorporated "[Carey's] grievance against the District given to [Carey's] immediate supervisor Ms. Leschper," and added that Carey "grieved" AISD's failure to respond to her March 29 grievance. (Docket Entry No. 13, Tab 2, Ex. B). On July 8, 1996, Carey's grievance was presented for review to Nadine Kujawa, the AISD Deputy Superintendent for Human Resources and Instruction. On July 17, 1996, Kujawa denied Carey's grievance, stating:

I have determined that you have failed to follow the mandatory procedures and time lines of the school district's grievance policy and those complaints are denied.…

The grievance policy required you to file your grievance with the Superintendent of Schools within ten (10) calendar days after you became aware or should have become aware of the decision or act from which the complaint arose.

(Docket Entry No. 13, Tab 2, Ex. C). Kujawa's denial letter stated that Carey had the right to appeal the denial to the AISD superintendent. (*Id.*). Carey did not appeal the denial.

On September 4, 1996, Carey filed suit in state district court against AISD and Leschper. Carey alleged that the nonrenewal of her employment contract gave rise to the following claims against AISD and Leschper in her official capacity: (1) violation of her free speech rights under the First Amendment of the United States Constitution and Article 1, Section 8 of the Texas Constitution; (2) deprivation of a property interest in her continued employment, in violation of her due process rights under the Fourteenth Amendment of the United States Constitution and the "Due Course of Law" clause of the Texas Constitution; (3) breach of contract; and (4) violation of her rights under the Texas Whistleblower Act, TEX. GOV'T CODE §§ 554.001 *et seq.* Carey also asserted a claim of intentional infliction of emotional distress against Leschper in her individual capacity. On December 2, 1996, defendants removed the suit to this court. Carey did not move to remand.

AISD and Leschper move for summary judgment dismissing all of Carey's claims against AISD and Leschper in her official capacity. They assert that defendants breached no constitutional right and violated no state statute. As to the claim against Leschper in her individual capacity, defendants assert qualified immunity.

---

1. Carey does not attach the grievance to her response and does not identify the precise allegations she made.

2. AISD's grievance procedure defines a "grievance" as "an oral or written complaint filed with the Superintendent of Schools and which concerns the grievant's wages, hours, or conditions of work, or which alleges unlawful discrimina-

tion in employment based upon sex, race, age, religion, natinal [sic] origin, handicapping condition, or the exercixse [sic] of constitutional rights." (Docket Entry No. 13, Tab 2, Ex. A, p. 1). A grievance must be filed "within ten (10) days after the employee became aware or should have become aware of the decision or act from which the complaint arose." *Id.*

## II. The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56. Under FED. R.CIV.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Norman v. Apache Corp.,* 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Little,* 37 F.3d at 1075.

When the moving party has met its Rule 56© burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir. 1995). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 323–27, 106 S.Ct. at 2553–54).

In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). "Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552).

## III. The First Amendment Claim

■ Carey alleges that AISD and Leschper, in her official capacity, retaliated against Carey for her complaints by refusing to renew her employment contract. Carey alleges that the nonrenewal violated her rights under the First Amendment of the United States Constitution and under Article 1, Section 8 of the Texas Constitution.[3] To show a constitutional violation, Carey must show that: (1) her speech involved a matter of public concern; (2) her interest in commenting upon matters of public concern was greater than the defendants' interest in promoting the efficiency of the public services they perform; and (3) her speech motivated the defendants' decision to take the adverse employment action. *Copsey v. Swearingen,* 36 F.3d 1336, 1344 (5th Cir.1994); *Thompson v. City of Starkville,* 901 F.2d 456, 460 (5th Cir.1990).

■ This court must first determine whether Carey's speech addressed a matter of "public concern." *Connick v. Myers,* 461 U.S. 138, 146–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). The determination of whether an employee's conduct addresses a matter of "public concern" is a question of law, to be resolved by the court. *Id.* at 148 n. 7, 103 S.Ct. at 1690–91 n. 7. If the speech does not touch on a matter of public concern, the inquiry is at an end and a court will not scrutinize the reasons motivating the employer's action. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context

3. Texas does not recognize a right to damages for violation of the Texas Constitution. *See City of Beaumont v. Bouillion,* 896 S.W.2d 143, 149 (Tex.1995). Carey also seeks equitable relief for the alleged violation of her Article 1, Section 9 rights. The Texas Supreme Court has stated that Article 1, Section 8 of the Texas Constitution may be interpreted more expansively than the First Amendment of the U.S. Constitution. *Davenport v. Garcia,* 834 S.W.2d 4, 20 (Tex.1992). However, the Texas courts have applied federal First Amendment precedent to evaluate retaliatory discharge claims asserted under Article 1, Section 8. *See, e.g., Brelsford v. University of Tex. Health Science Ctr.,* 1993 WL 15192, at *2–3 (Tex.App.— Dallas 1993, no writ) (unpublished opinion) (using First Amendment precedents to evaluate a retaliatory discharge claim under Article 1, Section 8).

of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 146–48 & n. 7, 103 S.Ct. at 1690 & n. 7, *quoted in Ayoub v. Texas A & M Univ.*, 927 F.2d 834, 836 (5th Cir.1991).

The courts have recognized that [b]ecause almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as a citizen or primarily in his role as employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment. *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir.1986) (citations omitted), *quoted in Ayoub*, 927 F.2d at 837. The court examines whether the public employee is speaking "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *Connick*, 461 U.S. at 146–47, 103 S.Ct. at 1690. If the employee is speaking as an employee, on matters that address her personal employment conditions, the First Amendment does not protect her from an adverse employment action for engaging in that speech. *Ayoub*, 927 F.2d at 837.

In *Ayoub*, the Fifth Circuit considered a professor's claim that he had been discriminated against in retaliation for his complaints about the disparate pay scale applied to foreign-born professors at a public university. The court found that Ayoub's speech did not involve a matter of public concern. The court noted that the content of Ayoub's complaints concerned the application of the alleged two-tier pay system to *him* and that he "never attempted to air his complaints in a manner that would call the public's attention to the alleged wrong." *Id.* at 837. The court concluded that Ayoub was not retaliated against, if at all, for speaking as a citizen on a matter of general or public concern "not tied to a personal employment dispute." *Id.*

In *Wales v. Board of Educ. of Community Unit Sch. Dist. 300*, 120 F.3d 82 (7th Cir. 1997), the Seventh Circuit recently considered complaints similar to those at issue in this case and followed the approach of the Fifth Circuit in *Ayoub*. Wales was a kindergarten teacher at a public school serving children with special education needs. Wales complained, in writing, about the principal's management of the school, the lack of discipline in the school, and the problems it caused for teacher and student safety as well as effective teaching. *Id.* at 82–83. The principal gave Wales a negative evaluation and the school board did not renew her contract. On an appeal from a grant of summary judgment in favor of the school board, the court framed the question as follows:

Did the school district penalize an expression of views about how the schools ought to run (forbidden) or consider an expression that revealed how the teacher manages or wants to manage her own class (permitted)? One clue . . . is to whom the statement was made. . . . Although the first amendment is not limited to speech that is broadcast to the world, an employee's decision to deliver the message in private supports an inference that the real concern is the employment relation—and a school district *as employer* may react to speech about the workplace in ways a government *as regulator* may not.

*Id.* at 84 (internal citations omitted) (emphasis in original). The court concluded that although the teacher's complaints addressed subjects of general interest to the public, her claim still failed as a matter of law because her expression was addressed only to the personal impact of those issues on her. *Id.*

In *Wales*, the court examined an earlier opinion, *Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403 (7th Cir.1994), which also involved complaints similar to those Carey relies upon as the basis of her claim. Cliff, a high school teacher, filed a retaliatory discharge claim under the First Amendment when the school district did not renew her employment contract at the end of the school year. *Id.* at 408. Cliff had made several complaints to the school board during the school year regarding "the large math classes she had been assigned and about the general disorder at [the high school]." *Id.* at 409. The Seventh

Circuit found that Cliff's complaints did not involve a matter of public concern. *Id.* The court acknowledged that the public may have been interested in Cliff's complaints:

> We have no doubt that the problems Cliff addressed are of widespread interest to the members of the community, and particularly so to parents whose children attend [the high school]. In a society increasingly concerned with the quality of public education, unusually large classes and general disorder in a public high school may be perceived as fostering an atmosphere that is less than conducive to the accomplishment of the school's educational mission. In that sense, the community would no doubt be interested in the comments of an experienced teacher like Cliff on such matters.

*Id.* at 410. However, the court found that those complaints "addressed only ... the personal impact of those issues on Cliff." *Id.* at 409. The court explained:

> [Cliff's] grievance addressed the class size and disciplinary problems not in general terms, but in the context of Cliff's own circumstances. For example, Cliff personally found it "very hard to maintain discipline effectively in these overcrowded classroom situations," and she asked "to have her class sizes reduced" and for "help with classroom discipline." ... [Cliff] was not speaking for other teachers at [the high school]; indeed, there is nothing in the record to suggest that other teachers had similar difficulties maintaining order in their classrooms.... Moreover, Cliff was not asking that the size of classes at [the high school] be reduced across the board; she was instead concerned only with the size of her own math classes. Indeed, Cliff pointed to the smaller classes that allegedly had been assigned to her math department colleagues to support her claim of unfair treatment.

*Id.* at 411.

It is useful to compare these cases, in which the complaints failed to achieve First Amendment protection, with cases finding teachers' criticisms of their schools or school systems to deserve constitutional status. In *Pickering v. Board of Educ.,* 391 U.S. 563, 566–574, 88 S.Ct. 1731, 1734–37, 20 L.Ed.2d 811 (1968), a teacher's letter to a newspaper criticizing the board of education for spending too much for athletics and not enough for teachers' salaries was found to involve a matter of public concern. In *Southside Pub. Sch. v. Hill,* 827 F.2d 270 (8th Cir.1987), special education teachers first complained to the special education program administrator for the school district, then to the school board, and then addressed a letter to the state department of education, criticizing delays and hindrances in the special education program. The Eighth Circuit found that the teachers were not asserting a private grievance as to their own employment circumstances or working conditions. *Id.* at 273. In *Wells v. Hico Indep. Sch. Dist.,* 736 F.2d 243 (5th Cir.1984), the plaintiff was a teacher and program director of a federally funded program to combat illiteracy. Her criticism of the lack of school board support for the program, expressed at public meetings, including meetings at which representatives of the Texas Education Agency, parents, and board members were present, was held to be protected. *Id.* at 249.

Applying these standards to the present case makes it clear that Carey's complaints do not, as a matter of law, pertain to matters of public concern. Carey's complaints about too many students in her class during the first six weeks of school; inadequate supplies; inadequate time devoted by the aide; denial of a "rightful" conference period, planning time, or lunch period; and the failure of the school to carry out the IEPs for some of Carey's students, resulting in their spending additional time in her class,[4] all focus on the effect of these actions on Carey and her working conditions. Such complaints do not cross the threshold the cases require to state a First Amendment claim.

---

4. Carey's complaint regarding AISD's failure to carry out her students' Individual Education Plans complains of the impact of the alleged failure to carry out the IEP's upon *her* classes, and *her* ability to teach. (Docket Entry No. 11, p. 6) ("Mrs. Carey was used as a dumping ground for special education and regular education students who were not wanted in the regular classes.").

Carey alleges that she and her husband complained to Ms. Evans, whom Carey describes as a "special education consultant" for the district and as "school district personnel," about the need for an additional special education teacher because Carey had too many students in her class at the beginning of the year. (Docket Entry No. 13, Ex. 3, plaintiff's answers to interrogatories). It appears, although it is not clear, that Carey may also have talked to Ms. Evans about "[q]uestions, as how the special education money was used [sic]." (*Id.*). Taking Carey's own answers in the light most favorable to Carey, her complaints still fail to meet the *Connick/Pickering* standard. These complaints focused on the effects the hiring and expenditure decisions had on the size of Carey's class and Carey's working conditions. Carey complained that the delay in hiring an additional special education teacher meant that there were too many children in Carey's class for six weeks. When the additional special education teacher was hired, Carey "asked why after three weeks she had not taken any of my students, as has been [sic] the directive from Ms. Evans," and "asked what happened to the special ed money that was being paid to Ms. Blasdale while she was teaching regular ed." (Docket Entry No. 13, Ex. 3, Interrogatory Answer No. 8). Carey complained that the special education aide assigned to her class did not spend the allotted number of hours in Carey's class and instead taught regular students. Carey "asked for the aid [sic], Mrs. Duke, to be in my room the entire day as she was getting paid for from special education funds." (*Id.*). Carey's complaints were not a publicized call for change; they were complaints to her immediate supervisor and the special education consultant about how the conditions in her classroom and at her workplace affected her.

██ Carey's affidavit attached to her response to defendants' motion for summary

judgment states that: "My reports were made only out of my consideration for the children in my class and for the taxpayers which pay the salaries of the aides and teachers." (Docket Entry No. 16, Ex. B). A plaintiff's after-the-fact declaration that her complaints were not made to benefit herself may be contradicted by the circumstances under which the complaints were made. See *Ayoub*, 927 F.2d at 837–38. The circumstances and context in which Carey made her complaints belie her contention. Although the forum in which speech occurs is not dispositive of the public concern component, *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 411–17, 99 S.Ct. 693, 695–97, 58 L.Ed.2d 619 (1979), courts have repeatedly recognized that a privately aired complaint about school administration, together with the content and context of the speech, supports an inference that the teacher's real concern is the employment relation; that the teacher is complaining about policies as they affect her. See *Ayoub*, 927 F.2d at 837 ("Certainly, Ayoub never attempted to air his complaints in a manner that would call the public's attention to the alleged wrong."); *Wales*, 120 F.3d at 84 ("Wales did not issue a public call for change; she complained to her immediate supervisor (and to her supervisor's supervisor) about how the conditions in her classroom affected her.").

Here, Carey aired her complaints to her supervisor Leschper, an assistant principal named Walker, and Ms. Evans. Although Carey's complaints included subjects of general concern to the public, her expression was addressed to the personal impact of those issues on her. Carey's complaints were made in the context of an ongoing dispute with her supervisor over Carey's working conditions.[5] The complaints are, as a matter of law, not matters of public concern.

Carey cites another recent Seventh Circuit case, *Khuans v. School Dist. 110*, 123 F.3d

---

**5.** Carey states in her answers to interrogatories that she told Leschper that "the newspaper could get her into trouble." (Docket Entry No. 13, Ex. 3, Interrogatory Answer No. 8). However, there is no evidence in the summary judgment record that Carey sought to contact anyone above Walker or Evans about her complaints, much less seek

a public forum. Carey did not exercise her First Amendment rights as a citizen to bring wrongdoing to light. Taking the evidence in the light most favorable to Carey, at most she threatened to go to the media in order to further her interest as an employee in her working conditions. *See, e.g., Terrell*, 792 F.2d at 1362.

1010 (7th Cir.1997), to support her argument that her complaints included possible violations of state special education statutes, and that these complaints addressed a matter of public concern. In *Khuans,* the court recognized that a teacher's report, to the school administration, of a supervisor's alleged violations of the Individuals with Disabilities Education Act could involve a matter of public concern. *Id.* at 1016. However, the court found that the bulk of the teacher's complaints concerned personal problems she had with her supervisor over working conditions and her own job. When the teacher's complaint was viewed in the context of the personal complaints about her supervisor, it was evident that the teacher was "upset with her supervisor and unhappy with how things were being run," and not speaking as a citizen. *See id.* at 1016, 1017. Similarly, the majority of Carey's complaints voiced concern about her own working conditions. In context, any complaint that Carey made that may have included questions of the school's compliance with special education requirements was motivated by her interest as an employee, not as a citizen. *Khuans* does not help Carey's argument.

■ Carey asserts that one basis of retaliation by Leschper was Carey's conversation with a social worker regarding the possible sexual abuse of one of her students. The courts have recognized that a teacher's report of suspected child abuse is a matter of public concern. *See, e.g., Cromley v. Board of Educ. of Lockport Township High Sch. Dist. 205,* 17 F.3d 1059, 1067 (7th Cir.1994); *Raposa v. Meade Sch. Dist. 46–1,* 790 F.2d 1349, 1352 (8th Cir.1986). However, Carey's own description of the conversation she had about the suspected abuse, taken in the light most favorable to Carey, does not make the conversation a protected one under the Constitution. Carey did not report a suspicion that a student was abused. Instead, she received a telephone call from a social worker who asked Carey questions stemming from the social worker's own suspicions. Carey's complaint states: "Mrs. Carey . . .

had not initiated the conversation—the social worker had." (Docket Entry No. 11, p. 6). Carey's third amended complaint alleges: "The social worker said that she thought the child and the child's sister were being sexually abused at home." (*Id.*). Although Carey later states that Carey had a statutory duty to report child abuse, there is no evidence that Carey even told her employer of the telephone conversation. *Cf. Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1051 (5th Cir.1996) (noting that an employee's complaint of corruption or wrongdoing must be made "to the public or to higher authorities"). Even if she did tell someone in AISD, Carey was acting as only a messenger, conveying the social worker's suspicion of abuse. *See Bausworth v. Hazelwood Sch. Dist.,* 986 F.2d 1197, 1198 (8th Cir.1993) (declining to find that a bus driver spoke on a matter of public concern when she merely conveyed to the school district a parent's concern about the school district's policy to charge parents the transportation costs for student field trips). Carey's allegation that Leschper "berated" her for returning the social worker's telephone call does not make that call protected First Amendment speech, made in Carey's role as a citizen rather than employee, on a matter of public concern.

This court GRANTS summary judgment dismissing Carey's First Amendment claim.

### IV. The Due Process Claim

■ Carey also alleges that AISD's nonrenewal of her employment contract was conducted without procedural due process guaranteed by the Fourteenth Amendment of the United States Constitution and the "Due Course of Law" clause of Article 1, Section 19 of the Texas Constitution.[6]

As noted above, Texas law does not recognize a cause of action for damages for Texas constitutional violations. *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 149 (Tex.1995); *Vincent v. West Tex. State Univ.,* 895 S.W.2d 469, 475 (Tex.App.—Amarillo 1995, extension of time to file for writ of error overruled). To the extent that Carey seeks equitable

---

**6.** Article 1, Section 19 states: "No citizen of this State shall be deprived *of* life, liberty, property, privileges or immunities, or in any manner dis-

franchised, except by the due course of the law of the land," TEX. CONST. art. 1, § 19.

relief based on her "Due Course of Law" claims, this court applies federal due process standards. *See University of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 929 (Tex.1995); *Texas Employment Comm'n v. Remington York, Inc.,* 948 S.W.2d 352, 357 (Tex.App.— Dallas 1997, n.w.h.).

A plaintiff claiming a deprivation of due process must identify a property interest entitled to due process protection. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). There is no property interest in state governmental employment unless state law creates such a property interest. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Courts applying Texas law have held that a teacher working under a probationary contract does not have a property interest in continued employment, as a matter of law. *See McCullough v. Lohn,* 483 F.2d 34, 34 (5th Cir.1973) ("[Plaintiff's complaint] makes no serious factual contention that as a probationary teacher he had such expectancy of reemployment as to entitle him to these safeguards for reemployment under the *Roth–Sindermann* principle."). In addition, the Texas Education Code was amended in 1995 to state that Texas public school teachers do not have a property interest in their employment beyond the term set by their employment contract. TEX.EDUC.CODE § 21.204(e).[7] Carey's employment contract guaranteed employment for only one school year. Carey was not terminated during that school year. "Nonrenewal occurs when a teacher is permitted to serve the full contract term, but is not offered a new contract for the following school year. Such failure to renew is not tantamount to dismissal or discharge because a contract for a specified length of time automatically expires at the end of the term." *Bowen v. Calallen Indep. Sch. Dist.,* 603 S.W.2d 229, 235 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.).

Carey notes that the AISD Teacher Handbook stated a procedure for nonrenewal of teachers' employment contracts. The published procedures required that the board give a statement of the reason for nonrenewal. Carey argues that because the board failed to state a reason for its action in the nonrenewal letter, it violated its own policies and therefore violated Carey's due process rights.

At most, the board procedures for nonrenewal created a property interest in continued employment that state law eliminated. Moreover, Carey's argument assumes her contention that she is entitled to a statement of reasons for nonrenewal under the Teacher Handbook. The Handbook requires the board to give a statement of reasons for not renewing a teacher's contract when the teacher is a "term contract" employee. (Docket Entry No. 16, Ex. A, p. 4); *see also* TEX.EDUC.CODE § 21.203. The Handbook does not require the board to give a statement of reasons for not renewing a teacher employed under a probationary contract.

Carey argues that she was not employed under a "probationary contract" because she was not a "probationary teacher." The AISD Teacher Handbook for the 1995–1996 school year defines a "probationary teacher" as a teacher with "less than two years of continuous service with the district." (Docket Entry No. 16, Ex. A, p. 5). Defendants have submitted competent summary judgment evidence that Carey's employment with AISD before the 1995–1996 school year was not "continuous." Carey resigned from employment at the end of the 1993–1994 school year. She later applied for reemployment and was not hired until after the 1994–1995 school year had begun. (Docket Entry No. 17, Affidavit of Nadine Kujawa; *id.,* Exs. A, B). Defendants also submitted an affidavit from Leschper in which she states that Carey was employed under a probationary contract. (Docket Entry No. 13, Tab 1, Affidavit of Cleba Leschper).

Carey argues that she was not employed under a probationary contract because she was in her third year of employment with AISD and probationary contracts only apply to teachers who are in their first or second

---

**7.** This amendment extinguished a property interest in continued employment under a "term contract" that had been found by the Texas Supreme Court in *Grounds v. Tolar Indep. Sch. Dist.,* 856 S.W.2d 417, 418 (Tex.1993).

year of employment with AISD. Carey alleges in her affidavit that "[a]fter my second year, I was told that pursuant to district policy, I was no longer under probationary status and that my continued employment would be dependent upon the quality of my performance." (Docket Entry No. 16, Ex. B).

Carey's summary judgment evidence does not raise a fact issue as to whether she was employed under a probationary contract. She does not respond to the evidence that her employment was not continuous. She does not identify who told her that she was no longer on probationary status, or indicate whether the person making the statement knew of Carey's interrupted second year of employment. Carey also ignores the fact that under the Texas Education Code, a probationary contract may apply to a third-year teacher. "A probationary contract may not be for a term exceeding one school year. The probationary contract may be renewed for two additional one-year periods, for a maximum permissible probationary contract period of three school years." TEX.EDUC. CODE § 21.102(b).[8]

Carey was not deprived of a property interest in continued employment when the board did not renew her contract after the 1995–96 school year. This court GRANTS defendants' motion for summary judgment on Carey's due process and due course of law claims against AISD and Leschper.

## V. The Breach of Contract Claim

 Carey alleges that AISD and Leschper breached Carey's employment contract.[9]

Carey alleges that because she worked for the district three years in a row, Texas Education Code §§ 21.201 through 21.208 applied to the nonrenewal of her contract.

Section 21.203 of the Texas Education Code states in pertinent part:

> The employment policies adopted by a board of trustees must require a written evaluation of each teacher at annual or more frequent intervals. The board must consider the most recent evaluations before making a decision not to renew a teacher's contract if the evaluations are relevant to the reason for the board's decision.

TEX.EDUC.CODE § 21.203(a); see also Docket Entry No. 16, Ex. A, p. 3. Carey alleges that her contract was breached because she was not evaluated until after the decision was made not to renew her contract. (Docket Entry No. 11, ¶ 9). In addition, section 21.203(b) of Texas Education Code states: "[A school board's] employment policies must include reasons for not renewing a teacher's contract at the end of the school year." TEX. EDUC.CODE § 21.203(b). The Teacher Handbook states: "The Trustees may choose not to renew the employment of any teacher employee under a term contract effective at the end of the contract period.... The notice of proposed non-renewal required in this policy shall contain a statement of the reason for such proposed action." (Docket Entry No. 16, Ex. A, p. 4). Carey alleges that her notice of nonrenewal contained no statement of reason for the proposed action.

Carey's contract states only that "[r]enewal, or nonrenewal, shall be in accordance with

8. The Texas Education Code uses the term "probationary teacher" on one occasion, in reference to a teacher employed under a probationary contract. TEX.EDUC.CODE § 21.103(b). However, the Code makes clear that a "probationary teacher" may be a teacher who is in her third year of employment:

> "If the board of trustees fails to give the notice of its intention to terminate the teacher's employment within the time prescribed by Subsection (a), the board must employ the probationary teacher in the same capacity under:
> (1) a probationary contract for the following school year, if the teacher has been employed by the district under a probationary

contract *for less than three consecutive school years.*"

*Id.* § 21.103(b)(1) (emphasis added). It therefore appears as if the AISD Teacher Handbook has defined "probationary teacher" in a more limited manner than does the Texas Education Code. The Texas Education Code's use of "Probationary teacher" would include Carey even if her employment had not been interrupted, and does not change this court's ruling on this claim.

9. *Compare* Plaintiff's Response to Defendants' Motion for Summary Judgment at 2 ("Plaintiff does not assert a state contractual claim against the District."), *with* Plaintiff's Third Amended Complaint at 11 (listing "Breach of Contract" as a cause of action to be asserted).

state law and Board policy." (Docket Entry No. 13, Tab 1, Ex. A). As noted above, Carey's arguments depend upon her ability to raise a fact issue that her contract was not "probationary" because she had worked in the district for three consecutive years without interruption. As noted above, defendants assert and provide summary judgment evidence that Carey was employed under three one-year probationary contracts, the last of which expired of its own terms at the end of the 1995–96 school year. Defendants recognize that under board policy, probationary teachers are those with less than two years continuous service with the district. Defendants respond to Carey's argument that she was beyond probationary status in 1995–96 by providing competent summary judgment evidence that Carey did not have two years of continuous service with AISD because she had resigned on May 27, 1994 and was reemployed after the start of the 1994–95 school year. Carey's summary judgment evidence does not controvert this evidence.[10]

It is also undisputed that the board applied to Carey the procedures applicable to nonrenewal of a probationary contract. The Texas Education Code's requirements for the nonrenewal of a probationary contract are that the board determine that the nonrenewal would be in the district's "best interests" and that the board "give notice of its intention to terminate the employment to the teacher not later than the 45th day before the last day of instruction required under the contract." Tex.Educ.Code § 21.103(a). Under the Code and the AISD Teacher Handbook, the requirements of an evaluation before a proposed nonrenewal and a statement of reasons for nonrenewal do not apply to a probationary contract. Id.; Docket Entry No. 16, Ex. A, pp. 4–5. Carey does not dispute that the board determined that the nonrenewal of her employment contract was in AISD's best interests,[11] or that the date she received notice of her termination, March 19, 1996, was within forty-five days before the last day of instruction.

Carey also alleges that AISD breached her contract because "[h]er contract called for payment over a twelve month period including medical insurance. Instead she received a bulk payment and the cancellation of the district's match to her medical insurance in June, 1996." (Docket Entry No. 10, p. 9). Carey presents no summary judgment evidence that her employment contract promised payment over twelve months, as

---

**10.** Defendants' summary judgment evidence in support of Carey's probationary status consists in pan of an affidavit by Nadine Kujawa, the AISD Deputy Superintendent for Human Resources and Instruction. (Docket Entry No. 22, affidavit of Nadine Kujawa). Carey moves to strike the following statements in Kujawa's affidavit as "conclusory": (1) "At all times relevant to this lawsuit, the District policy concerning probationary teachers provided that all teachers with less than two years of continuous service with the District were employed under probationary contracts"; (2) "Because she never served two continuous years with the District, Mary Ann Carey was always employed by the District pursuant to a probationary teacher contract"; (3) "At the end of that school year (specifically, on May 27, 1994), she resigned."; (4) "Some time later, Ms. Carey applied for re-employment with the District"; and (5) "This break in the Plaintiff's employment with the District in effect caused the two-year probationary period to begin again because in [sic] broke the Plaintiff's continuous service with the District." Carey also objects to the fifth statement listed above as "vague, ambiguous, incomprehensible, [and] insufficiently specific." (Docket Entry No. 22, p. 2).

This court denies Carey's motion. Kajawa's statements do not draw legal conclusions; they state facts of which she claims to have personal knowledge. See Galindo v. Precision American Corp., 754 F.2d 1212, 1216 (5th Cir.1985) (defining improper summary judgment evidence as "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' " (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738 (2d ed.1983))). Carey does not challenge the basis on which Kujawa makes these statements. The fifth statement listed above is not vague, ambiguous, or incomprehensible; it very clearly conveys that AISD considered Carey to be a probationary teacher because it believed she had not been continuously employed by AISD for two years.

Attached to Kujawa's affidavit is a letter of resignation from Carey, presumably submitted to AISD. Carey objects to the letter as hearsay. The letter is an admission by a party opponent. Fed. R.Evid. 801(d)(2)(A).

**11.** Carey's nonrenewal letter specifically states that "[i]n the Board of Trustees' judgment, the best interests of the school district will be served by terminating your employment," (Docket Entry No. 13, Tab 1, Ex. B).

opposed to over the nine-month term of the school year. Although Carey's contract uses the term "annual salary," the contract states that it lasts for the duration of the school year only: "The Board of Trustees ... hereby employs [Carey] as Teacher for 1 year(s). (Employees will be advised of the beginning and ending dates of the contract year(s) after the official school calendar for that term is adopted.)." (Docket Entry No. 13, Tab 1, Ex. A). Defendants present competent summary judgment evidence that the salary provisions of teachers' term employment contracts were interpreted to cover the school year, not the calendar year. Kujawa's denial of Carey's grievance stated: "Your one-year contract was for one school year, not for one 12 month period of time." (Docket Entry No. 13, Tab 2, Ex. C).

This court concludes that on the basis of the record before this court, Carey has failed to raise a fact issue as to whether AISD breached Carey's employment contract. Carey does not dispute that she had no contract with Leschper. This court GRANTS defendants' motion for summary judgment on Carey's state-law breach of contract claim.

## VI. The Whistleblower Act Claims

Carey alleges that her contract was not renewed because she reported violations of state law and board policy by Leschper and, perhaps, AISD. The Texas Whistleblower Act, TEX. GOV'T CODE § 554.001 *et seq.* (the "Act"), states in pertinent part:

A state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

*Id.* § 554.002(a). Carey's affidavit, attached to her response to defendants' motion for summary judgment, identifies the following alleged law violations that she reported:

There have been many violations of state, local, and district policies by the school where I worked, including:

1. Denying me a proscribed [sic] conference period for the entire year;

2. Denying me a duty free lunch;

3. Denying me the help of an aide that was assigned to me;

4. Overcrowding my classroom to the extent that it became detrimental to the children in my class;

5. Placing students from other grade levels in my class when a grade level classes were available and would have been more appropriate;

6. Denying me Special Education supplies allotted to my classroom the entire year; and

7. Physical and verbal abuse to me by Mrs. Leschper.

(Docket Entry No. 16, Ex. B). Carey also argues that her complaints that an additional special education teacher was needed in the beginning of the school year, and that Leschper was having aides assigned to the special education program teach regular classes, raised questions about possible misuse of funds allocated to special education classes. (Docket Entry No. 10, p. 3).

Defendants argue that Carey did not properly exhaust AISD's grievance procedure before suing under the Texas Whistleblower Act. Section 554.006 of the Texas Government Code states: "A public employee must initiate action under the grievance or appeal procedures of the employing state or local government entity relating to suspension or termination of employment or adverse personnel action before suing under this chapter." *Id.* § 554.006(a). Defendants concede that Carey filed a grievance with the AISD Superintendent's office on June 25, 1996. Defendants argue that because Carey failed to appeal AISD's denial of her grievance, she failed to "exhaust" her administrative remedies under section 554.006. Defendants also argue that Carey did not, as a matter of law, report violations of "law," as required by the statute.

Assuming, without deciding, that defendants accurately define the meaning of "exhaust" to include the appeal of a grievance denial, defendants are incorrect in asserting that Carey must have "exhausted" the AISD grievance procedure before bringing suit.

The pre–1995 version of section 554.006(a), entitled "Exhaustion of Grievance or Appeal Procedures," required a plaintiff to "exhaust" her employer's grievance procedures before bringing a whistleblower suit.[12] However, the statute was amended in 1995 to require an employee only to "*initiate* action under the [employer's] grievance or appeal procedures." *Id.* (West Supp.1997) (emphasis added). The title of the subsection was changed to "*Use* of Grievance or Appeal Procedures." *Id.* (emphasis added). No court has yet determined the intended impact, if any, of these changes in language. It appears that section 554.006 may not have required Carey to appeal AISD's denial of her grievance.

■ Assuming that Carey's filing of a grievance with AISD on June 25 was sufficient to allow her to bring suit under the Texas Whistleblower Act, her claims under the Act nonetheless fail because Carey did not report the violations she asserts to "an appropriate law enforcement authority," as required under section 554.002 of the Act. TEX. GOV'T CODE § 554.002.

Carey's affidavit states that she made her complaints to the AISD "Special Education Office." (*Id.*). Carey's answers to interrogatories state that she complained to "Ms. Walker, Ms. Leschfer [sic] and the diagnosis person for the district." Carey identifies "Ms. Walker" as an assistant principal at Inwood Elementary during the 1995–1996 school year. Ms. Walker was Carey's supervisor, but worked under Leschper. The Texas Government Code defines "an appropriate law enforcement authority" as:

> part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:
>
> (1) regulate under or enforce the law alleged to be violated in the report; or
>
> (2) investigate or prosecute a violation of criminal law.

TEX. GOV'T CODE § 554.002(b).

The summary judgment evidence that Carey offers does not show that Carey had a good faith belief that the "special education office" for the district, or "Ms. Walker, Ms. Leschfer [sic] and the diagnosis person for the district" were law enforcement authorities with the capability to "regulate under or enforce the law alleged to be violated."

The term "good faith" is used twice in section 554.002. Section 554.002(a) requires an employee to possess a "good faith" belief that his employer actually violated the law. TEX. GOV'T CODE § 554.002(a). The Texas Supreme Court has held that an employee's "good faith" belief that his employer violated the law requires that "(1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience." *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex.1996). This definition of "good faith" incorporates "both subjective and objective components." *Id.* There is nothing within the statute or articulated by any Texas court to indicate that a different definition of "good faith" should apply to an employee's belief that the person to whom she was reporting alleged violations of law be authorized to: (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law. *Cf. id.* (listing other contexts in which "good faith" was defined under Texas and federal law to include subjective and objective components).

Carey offers no explanation as to why she limited her complaints to the special education consultant for the district and the principal and assistant principal of her school. Carey's argument that she believed Leschper and Leschper's assistant were "appropriate law enforcement authorit[ies]" is especially perplexing, given that Carey's complaints concerned acts that Leschper herself allegedly committed.

This court finds that Carey has presented no summary judgment evidence indicating that: (1) she had a subjective belief that the special education office and the principal and

---

**12.** The pre–1995 version of section 554.006(a) read: "An employee of a local government must exhaust that government's grievance or appeal procedures relating to suspension or termination of employment or unlawful discrimination before suing under this chapter." TEX. GOV'T CODE § 554.006(a) (West 1994).

assistant principal had the power to regulate or enforce the state law and school district policies Carey alleges were violated; or (2) that such a belief would be reasonable, in the absence of her presentation of any evidence explaining these actors' roles in enforcing state or local law. This court GRANTS defendants' motion for summary judgment on Carey's Texas Whistleblower Act claims.

## VII. The Intentional Infliction of Emotional Distress Claim

Carey alleges that Leschper intentionally inflicted emotional distress upon Carey when she: (1) berated Carey following Carey's husband's complaint about the number of students in Carey's class; (2) berated Carey following Carey's phone conversation with the social worker about the alleged abuse of one of Carey's students; and (3) gave Carey a negative evaluation.

### A. The Qualified Immunity Defense

■■■■ Section 22.051 of the Texas Education Code provides professional employees with immunity for certain acts:

(a) A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

TEX.EDUC.CODE § 22.051(a).[13] Acts *not* involving "the exercise of judgment or discretion" are those " '[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.' " *Downing v. Brown,* 935 S.W.2d 112, 114 (Tex.1996) (quoting *City of Lancaster v. Chambers,* 883 S.W.2d 650, 654 (Tex.1994)). Professional employees receive immunity for acts within the scope of their duties as long as those acts are within the scope of the

employee's authority and are taken in good faith. *City of Lancaster,* 883 S.W.2d at 653.

■■■■ Termination and contract renewal decisions and employee evaluations are duties that require the exercise of a school supervisor's judgment and discretion. *See Jones v. Houston Indep. Sch. Dist.,* 979 F.2d 1004, 1007 (5th Cir.1992) (school principal's memorandum to school district administrator relating a teacher's alleged misbehavior toward students was written within the scope of the principal's duties); *Hix v. Tuloso–Midway Indep. Sch. Dist.,* 489 S.W.2d 706, 712 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.) (a nonrenewal recommendation for a teacher was within the scope of a school superintendent's duties); *Russell v. Edgewood Indep. Sch. Dist.,* 406 S.W.2d 249, 252 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.) (a discharge of teacher was within the scope of a school superintendent's duties); *see also Martinez v. Hardy,* 864 S.W.2d 767, 772–73 (Tex.App.—Houston [14th Dist.] 1993, no writ) (the performance evaluation of a file clerk was within the scope of a supervisor's duties). Leschper has submitted an affidavit stating that as school principal, she: (1) had authority to evaluate teachers before the school district's renewal decisions; and (2) acted in good faith in evaluating Carey. Carey has presented no summary judgment evidence to contradict either of these statements. As a matter of law, Leschper possesses qualified immunity for her "negative evaluation" of Carey.

### B. "Extreme and Outrageous" Conduct

■■■■ Carey's "negative evaluation" claim and her harassment claims fail because they do not allege "extreme and outrageous conduct" by Leschper, as a matter of law. To be liable for intentional infliction of emotional distress, an actor's conduct must be "extreme and outrageous." *Wornick Co. v. Casas,* 856 S.W.2d 732, 733 (Tex.1993). "Extreme and outrageous" conduct is that which is "atrocious," "beyond the bounds of decency," and "utterly intolerable in a civilized society." *Id.* at 734.

---

**13.** The Code defines "professional employee" as "a superintendent, principal, teacher, supervisor,

social worker, counselor, nurse, and teacher's aide." TEX.EDUC.CODE § 22.051(c)(1).

In the employment context, a claim for intentional infliction of emotional distress will not be supported by the broad range of conduct labeled as "mere employment disputes." *Id.* As the Fifth Circuit stated in *Johnson v. Merrell Dow Pharmaceuticals, Inc.,* 965 F.2d 31 (5th Cir.1992):

> In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees. Not all of these processes are pleasant for the employee. Neither is termination.... An employer will not be held liable for exercising its legal right to terminate an employee, "even though he is well aware that such [action] is certain to cause emotional distress."

*Id.* at 34; *cf. Wornick,* 856 S.W.2d at 735 ("[T]he fact of discharge itself as a matter of law cannot constitute outrageous behavior."); *Tarleton State Univ. v. Rosiere,* 867 S.W.2d 948, 952 (Tex.App.—Eastland 1993, writ dism'd by agreement) (a professor's refusal to recommend tenure was not outrageous conduct). Carey alleges nothing about the manner in which Leschper conducted her evaluation, or the conduct accompanying Carey's nonrenewal, that would constitute "extreme and outrageous" conduct. *See id.*

Carey also claims that on two occasions she was "berated" by Leschper, and therefore "harassed." The intentional infliction of emotional distress cause of action does not protect against mere insults, indignities, and threats. *MacArthur v. University of Tex. Health Ctr.,* 45 F.3d 890, 898 (5th Cir.1995); *Johnson,* 965 F.2d at 33. In *Mac-Arthur,* the court held that although a supervisor may have "lost control, rudely reprimanded [the plaintiff] or overreacted," the plaintiff had not presented evidence that the supervisor "demonstrate[d] conduct and actions so unjustified, so uncivilized, so based on malice, or so senselessly destructive of another that it rises to the level of 'outrageous conduct.'" *MacArthur,* 45 F.3d at 899. Carey does not allege that she was "berated" in a manner that rises to the level of "extreme and outrageous" conduct.

## VIII. Conclusion

This court GRANTS defendants' motion for summary judgment on Carey's First Amendment and Article 1, Section 8 claims; due process and "Due Course of Law" claims; breach of contract claims; Texas Whistleblower Act claims; and intentional infliction of emotional distress claims. Because this resolves all issues raised in this case, a final judgment of dismissal is also issued.